Joseph C. McHALE, Appellant,

v.

UNITED STATES of America,
Appellee.

Martin J. McHALE, Appellant,

v.

UNITED STATES of America,
Appellee.

Robert L. McHALE, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 20598–20600.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1968.

Decided June 11, 1968.

Certiorari Denied Dec. 9, 1968.
See 89 S.Ct. 462.

Mr. Carl L. Taylor, Washington, D. C. (appointed by this court), with whom Mr. Robert C. Maynard, Washington, D. C., was on the brief, for appellant in No. 20,598.

Mr. G. Nathan Calkins, Washington, D. C. (appointed by this court), for appellant in No. 20,599.

Mr. Francis C. Browne, Washington, D. C. (appointed by this court), for appellant in No. 20,600.

Mr. Lawrence P. Cohen, Atty. Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by

special leave of court, with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and TAMM, Circuit Judges.

BAZELON, Chief Judge:

Appellants, three brothers, were among several defendants tried jointly and convicted of mail fraud in connection with the operation of a debt consolidation business. The primary contentions of Robert and Joseph McHale are that the trial court should have granted their motions for severance. Joseph McHale also argues that the trial court improperly failed to instruct the jury on his theory of the case. Martin McHale, youngest of the brothers, contends that there was insufficient evidence to demonstrate his participation in the scheme and that the prosecution improperly relied on events subsequent to the last mailing named in the indictment.

I

The seven defendants in this case were all charged with participating in a scheme to defraud the customers of two debt consolidation companies. The Supreme Court has recognized that when several people are tried together there is a danger that adverse evidence against some of the defendants will improperly rub off on the co-defendants. In Blumenthal v. United States, 332 U.S. 539, 559–560, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947), the Court said "Perhaps even at best the safeguards provided by clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions, are insufficient to ward off the danger entirely. It is therefore extremely important that those safeguards be made as impregnable as possible."

In United States v. Kelly, 349 F.2d 720 (1965), the Second Circuit held that in some cases an even stronger safeguard—severance—might be required. *Kelly* involved fraudulent stock transactions. The evidence against one of the defend-

ants (Shuck) was far less extensive and far less incriminating than that against the other two. The court concluded that Shuck was inevitably prejudiced by the introduction of evidence against the co-defendants "[which] must have stamped them in the eyes of the jurors as unscrupulous swindlers of the first rank." 349 F.2d at 759.

■ To obtain severance under *Kelly* a defendant must at the very least prove that the evidence against his co-defendants is far more damaging than the evidence against him. It may well be that this is too rigid a requirement. It may well be that the dangers in these joint trials are so great that severance should be granted almost as a matter of course. But neither *Kelly* nor any other case goes that far. And careful consideration of the record convinces us that neither Robert nor Joseph McHale was entitled to severance under *Kelly*.

■ Joseph McHale contends also that the trial court improperly neglected to employ a safeguard recommended by the Supreme Court—adequate instructions. See Blumenthal, *supra,* 332 U.S. at 559, 68 S.Ct. 248. At trial Joseph submitted a written instruction stating at the outset that "Joseph McHale's defense is *not* that there was no scheme among any of the defendants. Rather, his defense is that the evidence shows he was not a party to any scheme, if there was one." The trial court gave no individual instruction for any defendant. Instead it advised the jury that: "The theory of the defense throughout is, first that there was no scheme to defraud; that if there was a scheme to defraud, the individual defendants had no knowledge of it and that each was acting in good faith in conducting his operations within the company." We cannot say that the difference between these two instructions is so great as to warrant reversal, particularly since appellant's instruction did not categorically accept the existence of a scheme, but hedged by using the phrase "if there was one."

## II

■ Martin McHale, who was only 22· at the time of the last mailing named in the indictment, contends that there was insufficient evidence that he knowingly participated in a scheme to defraud. The record demonstrates that, while the evidence against Martin was hardly overwhelming,[1] it was sufficient to send the case to the jury.

■ Martin's second contention is that the Government improperly presented evidence concerning events which took place after the dates mentioned in the indictment. The Government responds that these "subsequent acts of fraud were manifestations of the same continuing scheme to defraud, and were illuminating on the prior intent. * * *" One difficulty with this view is that the subsequent events took place when Martin had assumed a managerial position.[2] Hence they are not necessarily relevant to show his intent or knowledge at an earlier stage when he held less responsible positions.

Secondly, even if the subsequent acts have some relevance the question remains whether they were presented in such detail that Martin was in fact being tried for crimes not named in the indictment. The record indicates that most of the evidence against Martin concerned events subsequent to the mailing of the last count letter. This is clearly reflected in the transcript version of the Government's summation to the jury. Over three of the five pages of the summation deal with subsequent events.

McCormick makes plain that in determining the admissibility of other crimes evidence the trial court must employ a "balancing" process. McCORMICK, EVIDENCE 332 (1964). Here the balance must take into account that the evidence of misconduct prior to the last count letter was not great, that the evidence of subsequent misconduct was not completely relevant, and that the volume of the latter evidence far exceeded that of the former. Under these circumstances, we believe it was reversible error for the court to permit such extensive testimony on events subsequent to the last count letter.

Nos. 20,598 and 20,600 are affirmed. No. 20,599 is reversed.

TAMM, Circuit Judge (dissenting):

I dissent from only that section of the majority opinion which reverses the conviction of Martin McHale, *id est,* case number 20,599 in this court. The reversal is predicated upon the conclusion that the Government improperly presented evidence concerning events which took place after the dates named in the six count indictment charging eight persons with use of the mails in a scheme to defraud. The indictment, returned on June 8, 1965, enumerated use of the mails in furtherance of the scheme to defraud on September 23, 1961 (count one), April 6, 1962 (count two), June 20, 1962 (count three), July 30, 1962 (count four), January 31, 1963 (count five), and February 4, 1963 (count six). Martin McHale was found guilty of the charges contained in counts three, four, five and six of the indictment.

Martin McHale entered the employment of the involved debt consolidating firms in November, 1961 and served in various positions until, as manager at the Baltimore office, his employment terminated in May, 1963. Very briefly summarized, the Government's evidence established that as branch manager of the Baltimore office Martin McHale con-

---

1. One of the pieces of evidence against him was that he used a written interview procedure in which he represented to prospective customers that the company's accountants would determine when and in what amounts the company would deduct the installation charge, even though the company did not employ certified public accountants.

2. The date of the first count letter was Sepember 23, 1961 and the date of the last was February 4, 1963. Martin apparently became a manager of the Baltimore office of General Budget sometime during the second week in February, 1963.

tinued the established policy of deducting, despite contrary representations to the customers, the entire "installation charge" from the first payments made by customers, and before any remittances were submitted to creditors (Tr. 303–04); he instructed the manager of the Wilmington office to follow the same practice. (Tr. 1115–18.) The evidence established Martin McHale's knowledge that creditors of customers were not being promptly paid, and that customer payments were frequently being used for purposes other than the decreasing of the bills owed their creditors by the paying customers; and that in April 1963 he wrote a letter to an inquiring customer, falsely representing that certain creditors, about whom the customer inquired, had been paid, when in fact the customer's "account card" disclosed that those creditors had not been paid. (Tr. 1642–45.) The record disclosed that Martin McHale failed to refund monies owing to customers upon the termination or cancellation of the customers' accounts (Tr. 1650–51, 1700, 1760–61), and that he on occasion transferred amounts owing to customers on a refundable basis to the "refund sheet" account which account was used to pay operating expenses of the company. (Tr. 305–13, 320–23, 338, 452, 1471–73, 1478–80.)

The evidence at trial convincingly established a scheme to defraud wherein the company, contrary to its representations, fraudulently converted to its own use funds belonging to depositors and misrepresented the method and time of deduction of its own charges, as well as the nature of the services it would, or did, perform for its fee. The use of the mails in furtherance of the scheme was clearly established by the evidence. Martin McHale was convicted on four counts of the indictment relating to mailings taking place during the period of his employment.

Despite this record the majority set aside the conviction of Martin McHale because the trial judge admitted in evidence at the Government's request, additional testimony establishing a continua-tion of the same types of conduct, after the date of the last mailing identified, in the indictment, *id est,* February 4, 1963. This evidence related to conduct occurring on February 11–16, March 14, March 25, April 15, and May 31, 1963. The majority rejects this testimony of events subsequent to the last count letter despite strong academic views and judicial opinions which I believe make this testimony properly admissible against this appellant.

Professor Wigmore in discussing the distinctions existing between evidence addressed to proof of knowledge and that allowable to prove intent points out that "in evidencing intent, it is repetition of instances that tends to negative innocence in particular instances, and thus it is immaterial whether the instances are found occurring before or after the act charged. * * * The *length of time* over which we may range in search of evidential instances is obviously determinable by no fixed rule. The precedents illustrate various lengths of time. The discretion of the trial Court should here control." 2 J. WIGMORE, EVIDENCE § 316 (3d ed. 1940). *See also id.* at § 352, n. 2.

Case law was existent in 1840 to establish that "wherever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, tending to establish such intent * * * are proper evidence." Bottomley v. United States, 3 F.Cas.No. 1,688, pp. 968, 972 (C.C.D.Mass.1840). Circuit Justice Story in making this statement was ruling upon and approving the admissibility of evidence relating to transactions similar to that charged in a condemnation *in rem* proceeding which occurred after the transaction named in the information.

This question was again searchingly and broadly discussed by Judge Taft in 1896, in Penn. Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 72 F. 413, 38 L.R.A. 33 (6th Cir. 1896). "It is a well-established rule of evidence that, where the issue is the fraud or innocence of one in doing an act having the

effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same general subject-matter. The legal relevancy of such evidence is based on logical principles. It certainly diminishes the possibility that an innocent mistake was made in an untrue and misleading statement, to show similar but different misleading statements of the same person about the same matter, because it is less probable that one would make innocent mistakes of a false and misleading character in repeated instances than in one instance." 72 F. at 422. Reaching our specific issue herein, the fact that the evidence admitted included instances which occurred subsequent to the charged false statements, and were allegedly too remote in time as to the charged instance since they might relate to a fraudulent intent formed after an innocent mistake, Judge Taft continued:

> This possibility, of course, affects the probative force of these subsequent instances to show fraud, but we do not think it makes them inadmissible. In Wood v. U. S., 16 Pet. 342, the question was whether there had been fraud in invoicing importations under the customs revenue law. It was objected that, while similar undervaluations in other importations prior to the one in issue might be admissible, still it was error to admit such undervaluations in later importations. To this, Mr. Justice Story, speaking for the court said: 'The other objection has as little foundation, for fraud in the first importation may be as fairly deducible from other subsequent fraudulent importations by the same party as fraud would be in the last importation from prior fraudulent importations. In each case the quo animo is in question, and the presumption may equally arise and equally prevail.'

72 F. at 423.

In a more modern context the Ninth Circuit considered this question in Wal-ler v. United States, 177 F.2d 171 (9th Cir. 1949).

> Under familiar principles, relevant evidence of other offenses or acts, if similar and not too remote, may be admissible on the issue of fraudulent intent if such intent is a constituent and disputed element of the crime with which the accused is charged. Tedesco v. United States, 9 Cir., 1941, 118 F.2d 737; Lawrence v. United States, 9 Cir., 1947, 162 F.2d 156; Ny & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846; McCoy v. United States, 9 Cir., 1948, 169 F.2d 776, certiorari denied 335 U.S. 898, 69 S.Ct. 298 [93 L.Ed. 433].

> It is pointed out that the transaction of which the admitted contract is evidence occurred subsequent in time to the acts which base the present charge, and the claim is made that this time relation renders the evidence in question irrelevant and inadmissible, citing Witters v. United States, 1939, 70 App.D.C. 316, 106 F.2d 837, 125 A.L.R. 1031. Where other acts are offered as evidentiary of intent under the rule heretofore mentioned, it matters not whether they are subsequent or prior in time.

177 F.2d at 175–176. See also Green v. United States, 176 F.2d 541 (1st Cir. 1949), quoting with approval our opinion in Bracey v. United States, 79 U.S.App. D.C. 23, 142 F.2d 85, cert. denied, 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944).

If there is any suggestion that the challenged evidence was too remote in time, I point out that it spanned a period somewhat less than four months from the last date enumerated in the indictment. Compare this period with the time element involved in United States v. Blount, 229 F.2d 669 (2d Cir. 1956) in which evidence of a similar occurrence happening two years after the factual situation named in the indictment was held not to be too remote in time as to be admissible "for its probative effect on the issue of defendant's intent * * *." 229 F.2d at 672. See also United States

v. Feldman, 136 F.2d 394 (2d Cir. 1943), aff'd, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), in which evidence relating to similar activities and occurring from 13 to 20 months subsequent to the charged violations was held to be admissible on the issue of intent.

I find the record before us ample to sustain Martin McHale's conviction. I conclude that the evidence against him was "great" to utilize the term used in the majority opinion, that the evidence of subsequent misconduct was completely relevant, and that the volume of that evidence, in the light of all of the evidence offered by the Government, was not excessive. I would affirm this conviction.